## STEAMBOAT MIST *vs.* MARTIN, COWEN & CO.

[LIBEL IN ADMIRALTY AGAINST STEAMBOAT.]

1. *Admiralty jurisdiction, Federal and State.*—A demand for supplies furnished, in the port of Mobile, to a steamboat which is regularly licensed under the laws of the United States, enrolled at the custom-house in Mobile, and plying between that city and Columbus, Mississippi, and which belongs to a resident citizen of Mississippi, is a maritime contract, and can only be enforced, by admiralty process against the boat, in the Federal courts.

APPEAL from the City Court of Mobile.
Tried before the Hon. H. CHAMBERLAIN.

IN this case, a libel was filed by the appellees, on the 29th March, 1867, against the steamboat *Mist*, then lying in the port of Mobile, her tackle, apparel, &c. The libel was duly sworn to, and alleged that the libellants, "within six months last past, at the instance of the master and his agents, and during the time the said steamboat was navigating the waters of this State, sold and furnished to said steamboat victuals and supplies, amounting in the whole to the sum of one hundred and sixty-seven 87-100 dollars." A writ of seizure was thereupon issued, under which, on said 29th March, 1867, the sheriff took the boat into his possession. At the ensuing May term, 1867, M. B. Murphy, claiming to be the sole owner of the boat, filed a protest (or plea) to the jurisdiction, in these words : " Comes into open court M. B. Murphy," &c., " who says that, at the time the debt was made and contracted, the said steamboat *Mist* was engaged in navigation and commerce, between the city of Mobile, in the State of Alabama, and the city of Columbus, in the State of Mississippi ; that she is an American vessel, was built at Pittsburg, in Pennsylvania, and was duly enrolled and licensed, in pursuance of the laws of the United States, at the custom-house in the city of Mobile, and that said license was in full force at the

time she was libelled in this case. Respondent therefore submits that this honorable court has no jurisdiction of said case, and prays that said libel may be dismissed," &c. To this plea, or protest, the libellants filed a demurrer, or "exceptive allegation," as follows : " For answer to the allegations contained in the answer, claim, and plea to the jurisdiction, filed by the claimant, M. B. Murphy, the libellants say, that said allegations are not true in fact, and that this court has jurisdiction in the cause ; and further, that this court would have jurisdiction, if the said allegations in said plea were true ; and that said plea, and the allegations thereof, are wholly insufficient, in that they do not set forth any sufficient facts, or causes, why this court has not jurisdiction." The decree recites, that the demurrer was sustained by the court; " and no answer having been filed, denying the allegations contained in said libel and petition, it is considered by the court that they are admitted to be true ; and that the claim of Martin, Cowen & Co. has been sustained by proof, as a valid lien, to the amount of one hundred and sixty-two 52-100 dollars ; for which they are allowed a decree, together with their costs," &c. To the rulings of the court in sustaining the demurrer, and in allowing libellants' claim as a valid lien on the boat, a bill of exceptions was reserved by the respondent and claimant.

" M. B. Murphy, the owner of the boat, testified," as the bill of exceptions states, " that she was built at Pittsburg, Pennsylvania ; that he and one Mahan brought her to Mobile, in January, 1866 ; that she made a few trips on the Alabama river, when he purchased the entire interest in her ; that he and Mahan were resident citizens of Mississippi ; that he had been a resident citizen of Pascagoula, in Mississippi, for more than forty years, and was never a citizen of Alabama, and never resided here ; that he bought the boat to run between Pascagoula and New Orleans, and put her in that trade until August, 1866, when he brought her to Mobile, at the request of Rutland & Co., and put her on the Alabama river, intending to run her there during the season of low water; that she never returned to Pascagoula ; that she was registered in Mobile, and all her

46

papers were from the custom-house in said city; that he withdrew her from the Alabama river, in ——, 1866, and put her in the trade between Mobile and Columbus; that she was continued in that trade up to a short time before she was libelled, but was lying at Mobile at the time Martin, Cowen & Co., who were grocery-merchants, supplied her with their bill of goods; that she was licensed and enrolled, under the laws of the United States, at the custom-house in Mobile; that he (said Murphy) resided at his home in Mississippi, but was occasionally in Mobile during the time said boat was running between Mobile and Columbus that he took charge of the boat himself, two or three days before she was libelled, and started away from the wharf about eleven o'clock at night, having no pilot on board, and without giving notice of his intention to the libellants, intending to run her to Pascagoula, so that he might put her out of their reach, and, when there, might make arrangements with them; that she was snagged on the obstructions in the bay of Mobile, when he ran her over to the eastern shore, about four hundred yards from the end of the wharf, at Montrose, in Baldwin county, where she was seized by the sheriff of Mobile county."

Other libels were filed against said steamboat, subsequent to that of Martin, Cowen & Co. The bill of exceptions states, that the pleadings were the same in all the cases; that the cases were consolidated, by consent, and tried together; that the court sustained its jurisdiction in each case, and allowed the claim of each libellant, so far as it was sustained by the proof; and that exceptions were reserved by the respondent and claimant to the rulings and decree of the court in each case.

The rulings and decree of the court are now assigned as error.

W. Boyles, and Geo. N. Stewart, for appellant.—Under the pleadings and evidence in this case, the steamboat was a foreign vessel, being owned by a citizen of Mississippi, although enrolled at the custom-house in Mobile, and being engaged in navigation and commerce between Mobile, Alabama, and Columbus, Mississippi.—*Jackson v. The Magno-*

*lia*, 20 How. 296; 4 Wheaton, 443 ; 2 Story, C. C. 93; 1 New-berry's Adm. R. 189, 311, 313. The contract or demand sought to be enforced, under the pleadings and proof, is a maritime contract. Whatever doubts may have formerly existed on the question of jurisdiction in such cases, the recent decisions of the supreme court of the United States, which are binding on all the judicial tribunals of the coun-try, have established the doctrine, that the jurisdiction of the Federal courts in all maritime cases, whether growing out of torts or contracts, is exclusive.—*The Moses Taylor*, 4 Wallace, 411 ; *The Hine v. Trevor*, 4 Wallace, 555 ; *The Mary Washington v. Ayres*, decided by Chase, C. J., and reported in 5th Amer. Law Register, 692.

R. H. SMITH, *contra*.—1. The Federal courts have exclu-sive, original jurisdiction, of all " civil causes of admiralty and maritime jurisdiction." This jurisdiction can only be extended by act of congress, and within the limits of the constitutional grant.—1 Conkling's Adm. Pr. 6–12, and note ; 10 Wheaton, 428. There has been much conflict of opinion and decision, as to the precise meaning of the words, " civil causes of admiralty and maritime jurisdic-tion." The older decisions held, that these words applied only to contracts essentially to be performed on tide-waters, and services essentially maritime, or contracts essentially maritime in their nature.—10 Wheaton, 428 ; 7 Peters, 228, 344 ; 11 Peters, 175 ; 3 Sumner, 144, 149. The new cases go further, and say, that tide-water has nothing to do with the question of jurisdiction, provided the vessel is engaged in a maritime employment, and the contract is essentially maritime in its nature ; that it extends in such cases, but in none others, to all the large navigable rivers.—*DoLovio v. Boit*, 2 Gallison, 449 ; *The St. Lawrence*, 1 Black, 530 ; 11 Peters, 184 ; Conkling's Adm. Pr. 19–24, note *b*.

2. The question of this case, then, is, whether the con-tract sought to be enforced is maritime in its nature. Mari-time contracts, or contracts of admiralty jurisdiction, are said by Judge Story to be, " such as relate to contracts for maritime services, in the building, repairing, supplying, and navigating ships."—2 Gallison, 474. The ship also must

be engaged in a maritime employment.—21 Howard, 249; 11 Peters, 175. Even policies of insurance on ships are not of exclusive Federal jurisdiction.—2 Gallison, 475, 422. Admiralty jurisdiction does not extend to preliminary contracts, leading to the execution of maritime contracts.— 3 Mason, 6; 1 Conkling's Adm. Pr. 31. The libellants in this case were not material men; their business was not confined to maritime matters, nor even principally with such matters. The contract was simply a personal credit for a few days, given to the owner, in the usual course of trade, by a firm who were grocery-merchants.

The distinctive features of an implied admiralty lien are—1st, that the vessel must be in a foreign port; 2d, the supplies must be shown to have been necessary and proper for the ship; 3d, the credit must have been necessary, and must have been given on the faith of the ship, and not of the owner alone.—1 Conkling's Adm. Pr. 74, 78–81; 3 Sumner, 228–36; 3 Kent's Com. (3d ed.) 163; 1 W. Rob. 309, 360; 19 Howard, 31, 359; 9 Wheaton, 409; Ware's R. 263, 275. Where the owner is present, though the vessel is in a foreign port, the credit is presumed to have been given to him, and no implied admiralty lien arises. The fact that the vessel is in a foreign port, though material in determining whether the creditor may proceed *in rem* or *in personam*, has nothing to do with the nature of the contract, nor with the question of admiralty jurisdiction. While the creditors in this case could allege and prove all the facts necessary to establish a lien under the laws of Alabama, they could not make out a case of which the Federal court would take jurisdiction, since that court will not enforce a lien given by a State law merely.

BYRD, J.—Until within a recent period, the received doctrine of the courts, State and Federal, has been, that the admiralty jurisdiction conferred by the constitution of the United States did not extend to the navigable rivers of a State above the tidal line, and to vessels navigating such waters *exclusively* above that line. As an illustration, the Tennessee river is navigable from Decatur, Alabama, above the shoals, to Chattanooga, Tennessee, and vessels navi-

gating that portion of the river can not reach tide-water, on account of natural obstructions in the river; now it seems to me, that the mere grant of maritime and admiralty jurisdiction to the courts of the United States did not confer jurisdiction to them over a vessel navigating that portion of the Tennessee river described, nor give them jurisdiction over every contract or tort made or committed by such vessel. Nor do I know of any authority of any country in which the civil or common law prevailed at the time of the adoption of the Federal constitution, which would support the doctrine, that the jurisdiction of courts of admiralty extended to vessels navigating the rivers of a country exclusively above tide-waters.

At the time the act of congress of the 26th February, 1845, was passed, I do not think any one supposed that the act was based on the grant in the constitution of admiralty and maritime jurisdiction to the courts of the United States; or that the courts themselves had such jurisdiction over the rivers of the north-west. But that act was predicated on the grant to congress of the power to regulate commerce between the States, which is a distinct and independent grant from that of admiralty and maritime jurisdiction to the Federal courts. Hence, I can not see how the act of 1845 was any restriction of the jurisdiction of the courts under the judiciary act of 1789; as it seems the learned chief-justice holds in the case of *The Washington v. Ayres et al.*, 5 Law Register, 692; and that *therefore* the case of *Allen v. Newberry*, (21 Howard, 244,) is consistent with late adjudications, which hold that, under the judiciary act of 1789, the Federal courts have jurisdiction over all contracts and torts of vessels plying exclusively on the rivers of a State. The act of 1845 was intended to *enlarge*, not to *restrict*, the jurisdiction of the national courts.

In the case of *The Belfast v. Boon et al.*, (at the last term,) we held, that a contract of affreightment, made and to be performed *within* the State, and upon a river of the State, was not a maritime contract, and that by the maritime law the shipper had no lien on the boat for the goods shipped, if lost or destroyed. An appeal has been taken in that case, to the supreme court of the United States.

For over sixty years after the constitution was adopted, the almost uniform decisions of the State and Federal courts held, that the States, as to river navigation exclusively within their respective boundaries, had concurrent admiralty jurisdiction with the courts of the national government, and in some cases exclusive jurisdiction; and State legislation has for the same time been consistent with this doctrine.—*Allen v. Newberry*, 21 Howard, 244; and cases cited in *Belfast v. Boon, supra.* But late adjudications of the highest court in this country have departed from this doctrine, and, perhaps wisely, denied to the States any jurisdiction in such causes.

From the libel and the evidence in this cause it appears, that the claim of appellees is founded on a *maritime* contract, which is attempted to be enforced in a State court. Abbott on Shipping, m. p. 148, n. 1, and authorities there cited. It is therefore distinguishable from the case of the *Belfast v. Boon.* The plea to the jurisdiction of the court, under the decisions of the supreme court of the United States, was well taken, and fatal to the proceeding.—*The Hine v. Trevor*, and *The Moses Taylor*, 4 Wallace.

Hence, the judgments of the court below, in favor of the several parties, must be reversed, and the cause remanded. See authorities cited on brief of counsel. Whether *such a proceeding* could not be sustained, for materials furnished to a purely domestic vessel, or for liabilities incurred on account of or for a vessel, for which no lien is given by the maritime law, or to which the jurisdiction of courts of admiralty did not extend, where a lien is given by the statute law of a State for the payment of such materials or liabilities, and a mode is prescribed for its enforcement in the nature of an admiralty suit, is a question which it is unnecessary to decide, as this vessel was not purely a domestic one, but belonged to a citizen of another State, and was on its way to another State when it was libelled and seized.

Reversed and remanded.